THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>v.<br><br>ALTIVITY PACKAGING, LLC and<br>GRAPHIC PACKAGING INTERNATIONAL, INC.,<br><br>   Defendants. | |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

### I. NATURE AND PURPOSE OF THE PROCEEDING

On March 5, 2008, the United States filed a civil antitrust complaint seeking to enjoin the proposed merger of Altivity Packaging, LLC (Altivity") and Graphic Packaging International, Inc ("Graphic"). The Complaint alleges that the likely effect of the merger would be to lessen competition substantially in the production and sale of coated recycled boxboard ("CRB") in North America in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. This loss of competition likely would result in higher CRB prices in the United States. At the same time the Complaint was filed, the United States also filed an Asset Preservation Stipulation and Order ("Stipulation") and a proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the merger.

Under the proposed Final Judgment, which is explained more fully in Section III, Defendants are required to divest two Altivity mills that manufacture CRB. Until the Altivity CRB mills are sold and operated under new ownership, Defendants must ensure that the mills and related assets are operated as ongoing, economically viable, and competitive assets.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A. Defendants and the Proposed Transaction

On July 10, 2007, Altivity and Graphic announced plans to combine their businesses in a transaction valued at $1.75 billion. Altivity and Graphic are, respectively, the first and fourth largest producers of coated recycled boxboard ("CRB") in the United States and Canada (hereinafter, "North America"). CRB is a type of paperboard used to make folding cartons used in consumer and commercial packaging, such as cereal boxes. Both companies are also major producers (or "converters") of folding cartons made from CRB. The total annual volume of CRB supplied to the packaging industry in North America is valued at approximately $1.6 billion. The proposed merger would have created a single firm in control of approximately 42 percent of the total supply of CRB in North America.

Altivity, a Delaware limited liability company headquartered in Elk Grove Village, Illinois, is the largest CRB producer in North America. Altivity is also a major North American converter of folding cartons made from CRB and other types of paperboard. Altivity owns and operates five paperboard mills that produce CRB and 24 folding carton converting plants in

North America. Altivity's CRB mills have a combined annual production capacity of approximately 722,000 tons, or about 27 percent of total North American CRB supply. In 2006, Altivity had total sales of approximately $2 billion, including approximately $660 million in North American sales of CRB and folding cartons made from CRB.

Graphic, the fourth-largest CRB producer in North America, is incorporated in Delaware and has its principal place of business in Marietta, Georgia. Graphic owns and operates one CRB paperboard mill and 19 folding carton converting plants that produce folding cartons from CRB and other types of paperboard. Graphic's CRB mill has a total annual production capacity of approximately 390,000 tons, or about 15 percent of total North American CRB supply. In 2006, Graphic's total sales were approximately $2.4 billion, including approximately $357 million in North American sales of CRB and folding cartons made from CRB.

Graphic also is the largest North American producer of coated unbleached kraft ("CUK"), another type of paperboard. Graphic operates two CUK mills with a total annual production capacity of approximately 1.3 million tons, or about 55 percent of total North American CUK supply. In 2006, Graphic had approximately $1 billion in North American sales of folding cartons made from CUK.

**B.     Competitive Effects of the Proposed Merger**

   **1.     CRB is the Relevant Product Market**

The Complaint alleges that the production and sale of CRB is a relevant product market within the meaning of Section 7 of the Clayton Act. CRB is a type of paperboard made from recycled paper. CRB is manufactured by forming and building up multiple layers (or "plys") of recycled fiber, and then applying a clay coating to the top layer. The clay-coated top layer provides CRB with a smooth surface for good graphics printability. The bottom layer is left in

the natural color of the recycled fiber, typically a greyish or brownish hue, depending on the type of fiber used (grey, if recycled newsprint is used; brown, if recycled corrugated boxes are used).

CRB is an intermediary product (often called a "substrate" in the packaging industry) that undergoes conversion into folding cartons. CRB is the preferred paperboard substrate for a wide range of relatively low-cost folding carton applications, including dry food cartons such as cereal boxes. CRB typically is the single largest cost component of such folding cartons, accounting for as much as 65 percent of the cost of the folding carton.

In folding carton applications where CRB is used, other types of paperboard are not close substitutes for CRB. Uncoated recycled boxboard ("URB") is a lower-grade and lower-cost paperboard than CRB; it lacks the smooth coated surface that provides for good graphics printability needed in most folding carton applications.[1] Coated unbleached kraft ("CUK") is a clay-coated paperboard made from virgin wood pulp rather than recycled paper, and has a brown-colored back. CUK has greater strength and wet-resistance than CRB and is more expensive than CRB on a price per ton basis.[2] Solid bleached sulfate ("SBS") is another type of paperboard made from virgin wood pulp. Produced from bleached white pulp, SBS is the most expensive and highest grade of paperboard used in the folding carton industry.[3]

---

[1] URB is used in the construction industry to make products such as backing for gypsum wallboard. URB is also used to produce paperboard cores and tubes, such as industrial cores for winding paper and other flexible materials, commercial mailing tubes, and tubes for paper towels and toilet paper rolls.

[2] The large majority of CUK produced in North America is used to make beverage carriers (beer and soft-drink cartons) and refrigerated and frozen food packaging. CUK is valued for its high strength and resistance to wetness.

[3] SBS has a bright white finish on both sides, in contrast to CUK's brown back and CRB's grey or brown back. SBS affords the best printing surface of the paperboard grades, and is thus preferred despite its higher cost when superior printability is required. Consequently, SBS is

Because of the price and performance distinctions between CRB and the other folding carton substrates, few customers of CRB and CRB folding cartons consider URB, CUK, or SBS to be economical substitutes for CRB. Further, even where another substrate can provide acceptable performance at a similar price, few customers will switch from their existing substrate to an alternative substrate because doing so is time consuming, costly, and risky. The customer must first qualify the alternative substrate, and switching often requires modification of folding carton converting equipment and end-users' packaging lines. Customers of CRB and CRB folding cartons likely would not switch to URB, CUK, SBS, or any other potential substitutes in response to a small but significant and non-transitory increase in CRB prices to an extent that would make such a price increase unprofitable.

Based on relative price and performance for some customers, CUK would be the next closest substitute for CRB, and any switching by CRB customers to another substrate in response to a small but significant and non-transitory increase in CRB prices would primarily be to CUK. Switching by some customers to CUK would not be sufficient to make a CRB price increase unprofitable, for reasons including that the two North American producers of CUK (of which Graphic is one) are currently operating at near-capacity. However, if such switching to CUK would constrain a CRB price increase, CRB and CUK would constitute a relevant product market within the meaning of the Clayton Act, and the relevant market would be no larger than CRB and CUK.

---

often used to make cartons for higher-priced consumer goods, such as pharmaceuticals, cosmetics, and health and beauty products. When appropriately coated, SBS is also used in certain types of packaging that come into direct contact with food, again due to manufacturer and consumer preferences for its white appearance.

### 2. North America is a Relevant Geographic Market

As alleged in the Complaint, North America is a relevant geographic market for the supply of CRB (and for the supply of CRB and CUK) within the meaning of the Clayton Act. Due to relatively high transportation costs, unfavorable currency exchange rates, and other cost and marketing disadvantages to importing foreign CRB, CUK, or potential substitutes for CRB or CUK into North America, a small but significant and non-transitory increase in the prices of CRB produced in North America would not likely cause foreign suppliers to increase North American sales in sufficient volumes to make such a price increase unprofitable.

### 3. Anticompetitive Effects of the Proposed Merger

As alleged in the Complaint, the North American CRB market is highly concentrated. The proposed merger of Graphic and Altivity would further increase the level of market concentration by a substantial amount. The combination of Graphic and Altivity would control approximately 42 percent of total North American CRB supply. The market would have only three major competitors controlling a collective market share of approximately 86 percent. Using a standard concentration measure called the Herfindahl-Herschman Index (or "HHI"), the proposed merger would substantially raise market concentration in a highly concentrated market, producing an HHI increase of approximately 788 and a post-merger HHI of approximately 2745.

Further, the CRB market is currently operating at near capacity. Because of this condition and the fact that the proposed merger would substantially increase the capacity upon which the merged firm would benefit from a price increase, the merger would create incentives for a combined Graphic-Altivity to close one or more CRB mills or to otherwise reduce CRB production capacity or output. As a result, the North American CRB market would likely experience higher CRB prices than would have prevailed absent the merger.

Even if the relevant product market were broader than CRB and included CUK, the proposed merger of Graphic and Altivity would also substantially increase concentration in the North American market. In that event, the merger would produce a single firm controlling approximately 49 percent of total North American supply of CRB and CUK (combining Graphic's 35 percent and Altivity's 14 percent), and the four major post-merger competitors would have a collective market share of approximately 94 percent. The merger would substantially raise market concentration in a highly concentrated market, producing an HHI increase of approximately 991 and a post-merger HHI of approximately 3155.

4. **Neither Supply Responses Nor Entry Would Constrain Likely Anticompetitive Effects of the Proposed Merger**

The Complaint alleges that supply responses from competitors or potential competitors would not likely prevent the anticompetitive effects of the proposed merger of Graphic and Altivity. As stated above, existing North American CRB producers face capacity and other operational limitations that would constrain them from significantly expanding output in response to a post-merger Graphic-Altivity increase in the price of CRB. Further, to the extent that they have any additional capacity to produce more CRB, these producers would likely find it most profitable to react to a Graphic-Altivity price increase by raising their own prices.

Foreign producers import into North America small quantities of CRB, collectively accounting for approximately 90,000 tons and three percent of total CRB sales in North America. The ability of foreign paperboard producers to expand imports into North America is limited by their commitments to markets that are more profitable than North America, as well as significant transportation costs, logistical difficulties, currency exchange differences, and other disadvantages and competitive constraints to importing into North America. Thus, the potential

for expansion of foreign supply, by itself or in combination with other supply responses, would not likely be sufficient to constrain a small but significant and non-transitory North American CRB price increase.

New entry into the production and sale of CRB or CUK is costly and time consuming. Among other things, entry would require investments of over $100 million and two years or more to construct and install production equipment and facilities. New entry is not likely to occur on a timely or sufficient basis in response to a small but significant and non-transitory post-merger CRB price increase in North America.

### III.  EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment requires the Defendants to divest two of Altivity's CRB mills and all associated mill assets. The mills to be divested by the Defendants are the Altivity mill in Wabash, Indiana, with an annual CRB production capacity of approximately 159,000 tons, and the Altivity mill in Philadelphia, Pennsylvania, with an annual CRB production capacity of approximately 125,000 tons.

If Defendants do not divest the Wabash and Philadelphia mills within a prescribed period of time, the proposed Final Judgment provides for the Court to appoint a trustee, upon application of the United States, to accomplish the divestitures. If the trustee does not divest the Wabash and Philadelphia mills within a specified time period, the proposed Final Judgment authorizes the trustee to divest the Wabash mill and an Altivity mill in Santa Clara, California, with an annual CRB production capacity of 135,000 tons, in lieu of the Philadelphia mill.

Defendants' divestiture of the Wabash and Philadelphia mills would result in the sale of 284,000 tons of CRB production capacity, or approximately 11 percent of total North American CRB capacity, to a competitor or competitors of the merged firm. If a trustee is required to sell

the Wabash and Santa Clara mills, approximately 299,000 tons of CRB production capacity, or approximately 12 percent of total North American CRB capacity, would be divested. Under the proposed Final Judgment, the two mills may be sold to a single buyer, or to two separate buyers, with the approval of the United States in its sole discretion. In addition, the Defendants are required to satisfy the United States in its sole discretion that the divested assets will be operated as viable ongoing businesses that will compete effectively in the North American CRB market, and that the divestitures will successfully remedy the otherwise anticipated anticompetitive effects of the proposed merger.

In evaluating the likely competitive effects of the proposed merger, the United States considered market shares, costs of production, current and historical industry capacity and utilization, current and historical CRB market pricing, historical and projected market demand for CRB, and the relative demand elasticities of CRB and its next closest substitute, CUK. The United States concluded that allowing the merger as proposed would give the merged firm control of a sufficiently large amount of industry capacity as to create an incentive to reduce its CRB production capacity or output. The merged firm would have such an incentive because its CRB capacity would have been large enough to allow it to gain from an increase in the price of CRB by an amount that would exceed losses associated with the contraction of capacity or output necessary to generate such a price increase. The divestitures required by the proposed Final Judgment would remove this incentive by significantly reducing the merged firm's capacity and output and placing it in the hands of a competitor or competitors. As a result, the merged firm would not be able to recoup the losses associated with a contraction of capacity or output.

If a trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to

provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture. If any of the requisite divestitures has not been accomplished at the end of the trustee's term, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

Until the divestitures under the proposed Final Judgment have been accomplished, Defendants are required to comply with an Asset Preservation Stipulation and Order. Pursuant to this Stipulation and Order, the Defendants are required to preserve, maintain, and operate the divestiture mills as ongoing businesses, and prohibited from taking any action that would jeopardize the divestitures required by the proposed Final Judgment.

Finally, the proposed Final Judgment sets forth a process for and the circumstances when Defendants must notify the United States of future acquisitions by Defendants of a CRB mill or producer valued in excess of $2 million. This notification requirement would apply to transactions not otherwise subject to the reporting and waiting period requirements under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and runs for ten years from entry of the Final Judgment. The provision is intended to ensure that any such acquisition does not undermine the benefits generated from the divestitures required by the proposed Final Judgment.

## IV.   REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable

attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against the defendants.

## V.   PROCEDURES FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register. Written comments should be submitted to:

>   Joshua H. Soven
>   Chief, Litigation I Section
>   1401 H Street NW, Suite 4000
>   Antitrust Division
>   U.S. Department of Justice
>   Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants. The United States could have sought preliminary and permanent injunctions against the proposed merger. The United States is satisfied, however, that the divestitures required by the proposed Final Judgment will preserve competition in the market identified by the United States and that such a remedy would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, uncertainty, and the expense of a full trial on the merits of the Complaint.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific

> injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[4]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001). Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is

---

[4] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[5] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F.

---

[5] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of

Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[6]

### VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: March 5, 2008

Respectfully submitted,

Weeun Wang, Attorney
U.S. Department of Justice
Antitrust Division
Litigation I Section
1401 H Street, NW, Suite 4000
Washington, DC 20530
(202) 307-3952

---

[6] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").